EGAN, Respondent, v. BURNIGHT, Appellant.

(149 N. W. 176.)

1. **Attorney and Client—Compensation—Pleadings—Action on Express Contract, Recovery on Quantum Meruit—Amendment—Question for Jury.**

In an action by an attorney, upon an express contract, for compensation for services, which action was tried throughout upon the issue of whether or not there was an express contract, held, that plaintiff cannot recover upon a quantum meriut without amending his pleadings; and the trial court erred in submitting the question of quantum meruit to the jury.

2.  **Same—Contract, After Retainer, for Additional Compensation—
    Validity—Amount of Fees—Client's Right to Disinterested
    Advice.**

An attorney, retained by the wife in a pending divorce action
to represent her in all matters pertaining thereto, and who
received from her $250. as fees, which was more than he had
earned at that time, procured, upon request of the client, a
tentative agreement with her husband for a division of property
involved in the suit, and binding him to _withdraw certain
objectionable matter from the divorce petition. The wife,
being desirous of having the tentative agreement set aside
against her attorney's wishes, because dissatisfied with the ten-
tative property agreement, visited the attorney's office at his
request, and was induced by him, through his statement to her
that unless she did so he would not "go into this case or have
anything to do with it," to agree to pay him an additional fee
of $1000.; and this without advising her to seek independent
advice as to the value of the services to be thereafter perform-
ed by him, or to take time to think the matter over. The ten-
tative agreement required her husband to withdraw said objec-
tionable matter, but under the evidence it was doubtful whether
the wife was informed by her attorney of this fact. The
attorney had, previous to the holding of the interview at which
the agreement for additional fees was made, expressed entire
willingness to set aside the tentative agreement. **Held,** that
such agreement was void and unenforceable, regardless of the
attorney's motives in bringing it about.

3.  **Same—Contract for Additional Compensation—Obligation to
    Give Disinterested Advice Concerning—Burden of Proof.**

In an attorney's action on a contract for additional compen-
sation, entered into after his retention as attorney in a pend-
ing suit, **held,** that burden of proof was upon plaintiff to prove
that he advised his client fully as to her rights and duties; and
before he can claim he has done so he must show advice that
was as full, free, and void of all personal consideration on
his part as would have been the advice of any disinterested at-
torney; and this in relation to the agreement to pay the
additional compensation, as well as in relation to any other
matter concerning the conduct of the case.

4.  **Same—Contract for Additional Fee—Reasonableness of Amount,
    Rule of Determination of.**

Where an attorney, retained to represent a client in a divorce
suit, and who had, under his previous retainer, received more
fees than he had then earned, procured a contract for an
additional fee of $1000, under which contract a satisfactory
settlement in the suit, reached by one day's efforts would have
been full performance, **held,** the amount of such additional

fee was unreasonable; the reasonableness of contract in this respect being determined, not alone by the value of the services which might become necessary, but also upon the value of the least services that might, in contemplation of the parties, have constituted a full performance.

Smith, P. J., dissenting in part.

(Opinion filed October 26, 1914.)

Appeal from Circuit Court, Minnehaha County. Hon. Joseph W. Jones, Judge.

Action by George W. Egan against Alice E. Burnight, to recover upon an express contract for legal services. From a judgment for Plaintiff, and from an order denying a new trial, Defendant appeals. Reversed.

*Bailey & Voorhees,* for Appellant.

*George W. Egan,* Respondent, in pro. per.

(1) Under point one of the opinion, Appellant cited:

Morrow v. Board of Education of City of Chamberlain, 7 S. D. 553; Romeym v. Sickles, 108 N. Y. 650; Farmholz v. Taylor, 13 Ia. 500; Modell Township v. King Company, 41 Pac. 1059 (Kan.); Swarthout v. Lucas, 101 Mich. 609; Elliott v. Caldwell, 43 Minn. 357; Powder River Live-Stock Company v. Lamb, 38 Neb. 339.

Respondent cited:

Graydon v. Stokes, 24 S. C. 483.

(2) Under point two of the opinion, Appellant submitted: That the alleged contract is unconscionable and void. And cited:

Bar Association of Boston v. Hale, 83 N. E. Rep. 885 (Mass.); Hill v. Hall, 77 N. E. Rep. 831 (Mass.); Waterbury v. City of Laredo, 5 S. W. Rep. 81 (Tex.); Marshall v. Dossett, 57 Ark. 93; Elmore v. Johnson, 143 Ill. 513; Thomas v. Turner's Administrator, 87 Va. 1; Planters' Bank v. Hornberger, 44 Tenn. 531; Blaikie v. Post, 122 N. Y. Supp. 292.

Respondent submitted: That the contract was made by plaintiff and defendant after plaintiff had made a full and fair disclosure of all the material facts to the defendant, and it was entered into by her understandingly, and it was free from all inequitable considerations. And cited:

Shaffner v. Kober (Ind.) 28 N. E. 871; Schomp v. Schenck, 40 N. J. L. 195, 29 Am .Rep. 219; Zabrieskie v. Woodruff, 48 N. J. L. 610, 7 Atl. 336; Jenkins v. Williams, 2 How. Pr. 261;

Porter v. Parmly, 39 N. Y. Sup. Ct. 219; Allison v. Sheeper (N. Y.) 9 Daly, 365; Fuller v. Stevens (Ala.) 39 So. 623; Burke v. Baker, 97 N. Y. S. 768.

(4.) Under point four of the opinion, Appellant submitted: That respondent has failed to sustain the burden of proof put upon an attorney in an action to recover, of his client, fees based upon express contract therefor, made after the relation of attorney and client had been formed.

WHITING, J. This action was brought to recover a sum claimed due on an express contract. The complaint set forth that plaintiff was retained by defendant on March 20, 1911, to look after her interests in a divorce action then pending against her; that he was to secure the withdrawal of certain objectional matters contained in the petition for divorce, to make a satisfactory settlement between defendant and her husband of their property interests and the custody of their children, and, unless a satisfactory settlement was made, to appear in a fight of said divorce case in open court; that defendant agreed to pay plaintiff $1,000 for his services; that plaintiff had succeeded in procuring the withdrawal of the objectional matter contained in the petition for divorce, and had secured an adjustment of property interest and custody of children satisfactory to defendant; and that defendant had failed to pay the said $1,000 or any part thereof. Defendant entered a general denial, except that she admitted employing plaintiff to assist in the defense of said divorce action; she alleged she had paid him $250 for the services he performed, and that such sum was all said services were worth. The cause was tried to the court and a jury. There was evidence tending to show that plaintiff was retained by defendant and that, after he had performed certain services under such retainer, and while the relation of attorney and client existed, a contract was entered into, under which contract he was to continue to represent her in such divorce proceedings, and under which she was to pay him the sum of $1,000 whether the issues in such divorce action were adjusted out of court or settled upon a trial. At the close of all the evidence, defendant moved for a directed verdict, which motion was based upon the fact that the contract, if any, was entered into after the relation of attorney and client had come into existence. Such motion questioned the sufficiency of the evidence to prove facts establishing the

validity of the alleged contract, and such motion fairly presented the questions hereinafter discussed. The motion was overruled. The cause was submitted to the jury under instructions setting out many of the rules governing contracts entered into between attorneys and those who are already their clients; and the court then instructed the jury:

"A contract may be, in every other respect, entirely fair, and the attorney may have acted with complete honesty with his client, and yet, if the agreed compensation be unreasonable in amount, if more than a fair and reasonable compensation than ought to be allowed for that service, he cannot recover the amount. He is not entitled to more than a fair and reasonable compensation. The burden of proof rests upon the plaintiff to make out his case, the agreement and contract, and the fairness of the contract; its reasonableness as to amount. If the jury finds that this contract was made and was a fair and reasonable contract, the plaintiff is entitled to recover. But he is not entitled to recover any more than the jury find from the evidence was a fair and reasonable amount. If you find for the plaintiff and you believe his services were worth $1,000, return a verdict for the whole amount. If, however, you find for the plaintiff and believe his services were worth less than $1,000, then name in your verdict the amount you believe his services to be worth."

Defendant excepted to the court's submitting to the jury the question of whether or not the alleged contract was a reasonable and legal agreement, and to its submitting to the jury the reasonableness of the fee charged by plaintiff. The jury returned a verdict for plaintiff in the full amount claimed; judgment was entered thereon, a new trial was denied, and this appeal was taken from such judgment and order denying a new trial.

Respondent contends that there was no error because: (1) The evidence established a contract that was fair; that was made after a fair and full disclosure of all material matters; that was free from any inequitable considerations; and that was not excessive. (2) The question of whether the contract was fairly, equitably and legally made was one for the jury to pass upon. (3) That even though there was no binding contract, respondent would be entitled to recover, upon the quantum meruit, the value of his services; and, the jury having found such value to be $1,000, the judg-

ment should stand. Appellant contends: (1) That the undisputed facts show that the contract, if one was entered into, was entered into under such circumstances, and was of such nature as to render it void as against appellant; (2) that "respondent seeks to recover upon the contract alone, and it is the existence and validity of the contract which is at issue in this case, and not the value of the services rendered by respondent."

[1] We are unable to determine with certainty the theory upon which the trial court based the instructions we have quoted. Did it intend to charge as the law: (1) That there might be a contract binding in every respect, other than as to the amount recoverable thereunder, and that *under such contract* there could be a recovery of a *fair and reasonable* compensation? (2) That there might be a contract binding in every respect, but that the jury might find that there had been performed thereunder less services than was contemplated by the parties, and therefore plaintiff might recover *under such contract* what his services were worth? (3) That, if the jury found there was no binding contract, they might still find for plaintiff upon the quantum meruit? It is unnecessary for us to discuss the correctness of any instruction which was based upon the jury finding a binding contract and then permitting a partial recovery thereunder, for the reason that, as hereinafter held, there was no binding contract entered into. The court could not, under the pleadings, rightfully submit to the jury the question of quantum meruit. It must of course be conceded that, under all the authorities, where a contract between attorney and client is not binding upon the client, the attorney may, *in a proper action,* recover on the quantum meruit; but where a cause is tried throughout upon the issue of whether or not there is an express contract, and the complaint seeks relief only upon an express contract, the plaintiff must stand or fall upon such contract. Plaintiff sought no amendment of his pleadings. If, upon request of plaintiff and under proper amendment of the pleadings, the issue had been changed so as to present the question of quantum meruit, much of the evidence received would have become immaterial, and it would have required most careful instructions to have kept from the consideration of the jury evidence improper for its consideration and of a nature that might well, under such new issue, have been prejudicial to defendant. If such issue had been changed, it

is possible that the defense could and would have introduced evidence tending to dispute the amount of time and labor claimed to have been given to the divorce case by plaintiff, which evidence was wholly immaterial to the action upon express contract, wherein the issue as to work performed was, not the amount of work performed, but whether or not the contract was fully performed. Furthermore, on any issue of quantum meruit, defendant would have been, under the undisputed evidence, entitled to an instruction directing the jury to allow, as a credit, whatever part of the $250 it found had not yet been earned at the time of its payment. Above all, there would have been, under the evidence that was received, at least a question whether the plaintiff could recover upon the quantum meruit, or whether his recovery should be in accordance with the understanding had upon March 20th.

[2] On March 20th plaintiff was retained by defendant. The following is plaintiff's version of what took place between plaintiff and defendant on that day:

"Mrs. Burnight came to my office to engage me to defend for her a suit which had been brought by her husband. * * * I asked her about her pending suit and about the charges made against her and about the property and about the family. * * * She told me that her husband had accused her of being a habitual drunkard, of attempting to kill him, and of using foul and obscene language in the presence of their children, and that he had asked from her for the custody of three children, Agnes, Zoa, and little boy, the younger one being about 10 years old, and Agnes being about 13 or 14. She stated to me that she did not want to go into court. I stated to her: 'Mrs. Burnight, these are very serious charges, and the only way you can disprove them is to have a hearing in open court.' She said to me her mission to my office was to see if I would go down to Westfield and see her husband and see if I could not effect some settlement. She says: 'I personally and particularly, Mr. Egan, want you to get me these children, and to get those charges withdrawn, and see if you cannot settle this so I will not have to go into court.' She asked me what my charges would be. I told her I charged $100 a day when I was out of my office working for anybody. · She says: 'Will you go down there and see if you can make a settlement.' I told her

I would. On the next day, the 21st of March, I went to West-field."

Plaintiff testified that on March 21st he met defendant's husband and his counsel, and a tentative agreement was reached, under which the property interests of the parties and the custody of their children was agreed upon, and it was agreed that the husband should withdraw the objectionable charges from his petition. It appears that this tentative agreement was to be carried out, subject to the court's approval, when the divorce action came up for hearing before the court. Defendant at first approved of the agreement as it was reported to her, but there is considerable uncertainty, as will hereinafter appear, whether or not she was advised that the tentative agreement included an agreement by her husband to withdraw the objectionable charges contained in his divorce petition. Defendant sent plaintiff the sum of $250 on March 24th, in payment for his services. That plaintiff understood his services were not completed, and that he had not yet earned the full amount received, appears, in two letters written by him; one, on March 25th, to an associate counsel to whom he wrote, in relation to the terms of the tentative agreement:

"I have secured her or *will have secured, when the matter comes up,* a withdrawal of all the objectionable charges, and that means a great deal to her. * * * In the preparation of the pleadings and decrees, I shall use the greatest vigilance to protect her, and if, when the final issue comes, they do not come up to their agreement, of course I will immediately notify her and she can take any steps she desires"
—the other written March 28th, to defendant, wherein, after noting that she had expressed some dissatisfaction with the tentative agreement, he wrote:

"I would rather send you back the money you sent, *which I have not yet fully earned,* and withdraw from the matter than to have you feel dissatisfied for a minute."

There was correspondence between plaintiff and defendant, after the tentative agreement was reached, wherein defendant expressed dissatisfaction with the terms thereof *so far as it fixed the property rights of the parties.* In her letters she expressed a desire to go back upon the agreement and contest the whole matter in court rather than accept of the terms of such agreement.

On March 28th plaintiff wrote defendant a letter, and in this, the last letter written before the conference at which it is claimed the $1,000 contract was entered into, plaintiff, among other things, said:

"As I told you at Westfield I must repeat to you again, that the only way that you can ever get a full hearing on the property deal is to fight your case in court. * * * You stated to me that, under no consideration, did you want to go to court. This being true, Mrs. Burnight, it was necessary for me to make the best possible settlement that I could out of court, and I feel that I have done this. However, if it should suit you better, I will simply file an answer and notify Mr. Burnight and his attorneys that we will submit the whole matter to the court. The result of such an action would be this, if Burnight does not own any property except the Pike Farm, then, in that event you would not get as much property turned over to you by the court as I secured for you, by our tentative agreement, but if he had thirty-five or forty thousand dollars in addition to the Pike Farm, you might then be able to get more money than I can get for you by this tentative agreement. The court would not make an allowance for the children to be paid by Mr. Burnight any larger, if as large as the one I secured by the settlement. * * * I am willing to do whatever you want me to do, but you must settle down on some one thing either *that you are satisfied with the proposed settlement and will live up to it or you must direct me to proceed to declare the tentative agreement off and get ready for trial.* * * * You are old enough to know your own mind, and if you think Mr. Burnight is fooling us in the amount of property, say so and get ready for trial. I do not want any dissatisfaction about this settlement because there is plenty of time to declare it off and get ready for trial. I would rather send you back the money that you sent me, which I have not yet fully earned, and withdraw from the matter, than to have you feel dissatisfied for a moment. I wish you would please advise me what you want done. * * * Either we must go into court on the fourth day of April ready to fight, or we must abide by our tentative agreement. It is up to you to say which."

In answer to this letter, defendant, on March 30th, phoned plaintiff that she had made up her mind to have the case opened

up and tried, and he phoned her: "If you are fully convinced of that, come up and we will talk it over." She came up the same day, and, according to plaintiff's testimony, the following occurred:

"She came into my office after the lunch hour some time. I was in my private office. Mr. Sallinger was in there. * * * I said to her, 'You are bound to open up that case, are you?' She says, 'That is what I am here for.' I says: 'Mrs. Burnight, Mr. Sallinger is a member of the bar, and I would like with your permission to state to him something of your case and state to him just what I have done for you and the provisions of the settlement and see what he thinks, because I am persuaded that it is a good settlement.' She says, 'You may.'"

Plaintiff then testified to making a statement of the facts relating to the divorce action and to explaining the terms of the tentative agreement, but his statement of the terms of the tentative agreement contained no reference to the fact that defendant's husband had agreed to withdraw the objectionable allegations from the complaint. His testimony continues as follows:

"Sallinger says: 'Egan, you have made a good settlement for that woman.' He says, 'Mrs. Burnight, under that statement of property, Mr. Egan has got you more probably than any court will give you.' She says: 'Mr. Burnight has lied to Mr. Egan about his property, and I want to go into court.' I says: 'Mrs. Burnight, I do not want to go into court with that case. I told McDuffie & Keenan we had agreed, and it will be boylike for me to go back and try to kick this settlement over.' She says: 'I insist on its being done. I know that he has lied to you, and I want to fight this case out.' I says: 'I will not go into this case or have anything to do with it unless you pay me $1,000,' She says, 'I will pay you that, Mr. Egan.' I says, 'In addition to that $1,000 I shall expect you to pay me the money I pay out for you and the expenses I incur.' She says, 'I understand that, and I will do that.' I says: 'Are you sure you are satisfied.' She says, 'Yes.' I says, 'Have you thought it all over carefully?' She says, 'I have.' I says, 'You want me then to open up this case and you want to pay me $1,000 for doing it.' She says, 'Yes, I do.' I says, 'Suppose I go to work and open this up and kick this settlement all over, and then at the last moment you want to settle it up then.' She says, 'I will pay you $1,000 and expenses anyway.' I then

pushed a little button on one of my tables and called in Miss Walz. I said to her, 'Bring in your notebook.' She brought in her notebook, and I said to her, 'Take down this conversation.' Then I said to her: 'Mrs. Burnight, are you bound to open up this case?' She says: 'I am.' Then it was taken down, the conversation as read here today by Miss Walz to the jury."

The conversation testified to by Miss Walz was, in substance, but a repetition of the conversation above testified to, excepting that Miss Walz testified that defendant said:

"I do not propose to rest under these charges. * * * I want the charges of drunkenness withdrawn, I want you to see that it is done."

Mr. Sallinger, called by plaintiff, related the conversation in plaintiff's office, just as plaintiff related same, except that he swore that when plaintiff said to defendant he would not open up the case unless she paid him $1,000, "She replied if he could get *certain charges withdrawn* and open the matter up, she would willingly pay him $1,000 and expenses, and she refused to let it remain in that condition." Plaintiff testified that, after this conversation, he procured from defendant the necessary data for the preparation of her answer in the divorce case, and, in her presence, prepared a telegram advising her husband's attorneys to await a letter from him before filing their amended petition. The tentative settlement was overturned, plaintiff prepared his client's case for trial, and, after the trial had commenced, he, with the consent of his client, effected a settlement of property rights and custody of children, which settlement was adopted by the court in its decree in the divorce action, which decree was granted the husband without further contest. While the evidence is uncontradictory that the tentative agreement included an agreement to withdraw the objectionable charges from the divorce petition, there is not a syllable of evidence, from any witness, except plaintiff himself, that this part of the agreement was communicated to defendant. No mention of it was made in any letter passing between plaintiff and defendant.

Section 410, C. C. P., provides in part that:

"The amount of fees of attorneys, solicitors and counsel in civil and criminal actions must be left to the agreement, express, or implied, of the parties."

In speaking of a similar section in the Code of New York, the court in Haight v. Moore, 37 N. Y. Super. Ct. 161, well said:

"The Code, in extending the rights of attorneys by allowing them to contract with their clients as to compensation beyond the allowances given by statute, relieved attorneys from a disability which before existed, but did not relieve their dealings with their clients from the supervision which the courts have at all times exercised. The reasons for that supervision exist as strongly as ever, and the Code has in no respect changed or interfered with them. Whenever a contract between an attorney and client gives benefits or advantages to the attorney, the court will scrutinize it with great care. All presumptions are in favor of the client, and against the propriety of the transaction, and the burden of proof is upon the attorney to show, *by extrinsic evidence,* that all was fair and just, and that the client acted understandingly."

And under a similar statute, it was held in Thomas v. Turner's Adm'r, 87 Va. 1, 12 S. E. 149:

"Before entering on the business of his client an attorney may contract for the measure of his compensation, and a contract then made will stand on the same footing as any contract between other persons competent to contract. This is now settled by the statute. Code, § 3201. But after the fiduciary relation has commenced, and while it continues, no agreement for compensation will be upheld in equity unless it be shown, not only to be reasonable, but that it was entered into under the circumstances just mentioned. Indeed, the established rule, broadly stated, is that an attorney who accepts a security or other benefit from his client must show that the client had the information and advice which he presumably would have received, and that he is not worse off than he presumably would have been, if he had consulted a competent adviser who had no selfish end in view; and especially is this so when the transaction is connected with the subject-matter of litigation, as then the confidence reposed, and the influence of the relation, place the client most in the power of his attorney. * * * In the often cited case of Gibson v. Jeyes, 6 Ves. 267, the lord chancellor, in delivering judgment, said: 'It is asked, Where is that rule to be found? I answer, In that great rule of the court that he who bargains in matter of advantage with a person placing confidence in him is bound to show that a reasonable use has been made of that con-

fidence, a rule applying to trustees, attorneys, or any one else.'
Nor is this rule affected by the statute above mentioned, the object
of which was simply to make the fees of an attorney a lawful sub-
ject-matter of contract."

See, also, Keenan v. Scott, 64 W. Va. 137, 61 S. E. 806.

It is well to consider a few of the authorities and determine
just what is the established law under facts such as are presented
to us by this case. In Thomas v. Turner's Adm'r, supra, and im-
mediately before the above quoted words of that decision, that
court said:

"Tested by the equitable and wisely established rule which
applies to such cases, it is very clear that the decree upholding the
transaction in question is erroneous. According to that rule all
dealings between attorney and client, for the benefit of the former,
are not only regarded with jealousy and closely scrutinized, but
they are presumptively invalid on the ground of constructive fraud,
and that presumption can be overcome only by the clearest and
most satisfactory evidence. The rule is founded in public policy,
and operates independently of any ingredient of actual fraud or of
the age or capacity of the client, being intended as the protection
to the client against the strong influence to which the confidential
relation naturally gives rise. It is the duty of an attorney to give
to his client the benefit of his best judgment, advice, and exertions,
and it would be a just reproach to the law if he were permitted
to bring his own personal interest into conflict with that duty by
securing a benefit to himself through the influence which the rela-
tion implies. All transactions between the parties to be upheld in
a court of equity must be uberrima fides, and the onus is on the
attorney to show, not only that no undue influence was used or
advantage taken, but that he gave his client all the information and
advice as against himself that was necessary to enable him to act
understandingly. He must show in other words: (1) That the
transaction was perfectly fair; (2) that it was entered into by the
client freely; and (3) that it was entered into with such a full
understanding of the nature and extent of his rights as to enable
the client to thoroughly comprehend the scope and effect of it."

The following from the same opinion seems peculiarly applica-
ble to the facts of this case:

"The learned counsel seem to have forgotten that it was as

much the appellee's duty to put her on her guard against her own generous inclinations as against himself. A disinterested, competent adviser, had such a one been consulted, presumably would have done so, and in view of his large personal interest in the matter and her ignorance and inexperience, he ought to have recommended her to seek such advice; for, as was well said in Doswell v. Anderson, 1 Pat. & H. 185, when the interest and duty of a fiduciary are placed in opposite scales, we need no law books to teach us which will preponderate. Independent advice, it is true, was not essential to the validity of the contract, but, as a precaution against undue influence, it is always proper and would have been especially so in the present case. * * * The rule we have mentioned was intended to prevent it, or, in other words, to shut the door as well against the temptation of an attorney to take advantage of the unguarded generosity as of the actual necessities of his client."

Lord Eldon in Huguenin v. Baseley, 14 Ves. 273, said:

"The question is not whether she * * * knew what she was doing, had done, or proposed to do, but how the intention was produced, whether all that care and providence was placed around her, as against those who advised her, which from their situation and relation with respect to her they were bound to exert on her behalf."

In Dickinson v. Bradford, 59 Ala. 581, 31 Am. Rep. 23, the court said, the underscoring being ours:

"The relation of an attorney to his client is one of trust and confidence, in which influence is, of necessity, acquired. The law does not incapacitate him from contracting with, or from becoming the recipient of, the bounty of the client. It does, however, command that all his transactions with the client shall be anxiously and jealously scrutinized, that the client may be protected *from his own overweening confidence, and from the influence or ascendancy which the relation generates.* 1 Story's Eq. §§ 310-314; 2 Lead. Eq. Cases (4th Am. Ed.) 1216. * * * The court does not interfere, or refuse interference, because there has been deceit, or imposition, or actual fraud, but *independent of such facts and ingredients, upon considerations of public policy, to prevent fraud, an abuse of confidence and influence, and to compel fidelity and unselfishness in the performance of fiduciary duties.* In this state

attorneys and solicitors are entitled to compensation for their services. Before entering on the business of the client, and suffering him to repose in them the trust and confidence of the relation, they may stipulate the measure of their compensation, and if the client assents, the contract is as valid and as free from objection as any other contract into which he may enter. *But if they assume the relation, enter on the duties, thereby inviting confidence, and acquiring influence, without expressly stipulating the measure of compensation, no subsequent agreement with the client can be supported, unless it is satisfactorily shown that the compensation does not exceed a fair and just remuneration for the services which have been, and which it is, the duty of the attorney to render.* Lecatt v. Sallee, 3 Port. [Ala.] 115 [29 Am. Dec. 249] ; McMahon v. Smith, 6 Heisk (Tenn.) 167; Planters' Bank v. Hornberger, 4 Cold. [Tenn.] 578. Standing, as the parties do, in a relation of confidence, which gives the attorney or solicitor an advantage over the client, the burden of proof lies on the attorney or solicitor; and, to support the contract made while the relation existed, he must show the fairness of the transaction and the adequacy of the consideration. The principle is thus stated by Judge Story: 'But the burden of establishing its perfect fairness, adequacy, and equity is thrown upon the attorney, upon the general rule that he who bargains in a matter of advantage with a person, placing confidence in him, is bound to show that a reasonable use has been made of that confidence, a rule applying equally to all persons standing in confidential relations with each other.' * * *

"Having entered on the duties of the relation without a contract stipulating the measure of compensation, the appellee and his partner, had no other legal claim on the appellant than *the right to demand of him reasonable compensation for their services.* If the contract subsequently made stipulates for greater compensation, it cannot be supported, unless it affirmatively appears that there is an absence of undue influence, and *the best evidence of its absence would be that the attorneys gave to their client the information and advice which it would have been their duty to give if the client had been dealing with a stranger, conferring on him the same rights and advantages, on the same considerations, which the contract confers on them.*"

In Lecatt v. Sallee, 3 Port. (Ala.) 115, 29 Am. Dec. 249, the

leading American case upon the questions before us, the court after reviewing the holdings of the English courts in numerous decisions, concludes that:

"The firmest ground for the support of the principle to which the complainant has resorted, for relief, consists of the confidence reposed by a client in his attorney, and the influence which an attorney has over his client. Confidence is as necessarily reposed here, by a client, in his attorney, as it is in England. The influence of an attorney, during the connection, is as great here as it is there; and no consequence against which it is the object of justice to guard could attend such contracts there, which would not follow them in this country. Integrity of character and purity of motive have never enabled such contracts to stand in full force against the principle of equity, which commonly excludes all inquiry into the fairness of the transactions and sets them aside as violations of the policy of justice. No principle has been more rigidly adhered to by the English chancellors, and we shall not take the liberty to depart from it. The principle will best preserve the high reputation of the profession, by elevating its members above the temptation to exercise their influence, to obtain advantageous bargains of their clients, and, consequently, above the suspicion of having done so."

The following from Bolton v. Daily, 48 Iowa, 348, is directly applicable to the situation herein, the underscoring being ours:

"We think that where an attorney sets up an express agreement to pay such a fee, exacted of a client when the work was two-thirds done, under a threat of withdrawing from the case if the agreement was not made, nothing but the best of reasons would be sufficient to uphold the agreement. No attorney can be permitted to take advantage of his relation to his client, and the exigency of his client's business, to exact an unconscionable agreement. * * * *It is difficult to conceive how the plaintiff could be so complicated as to justify him remaining in the case for an extraordinary fee, but not for an ordinary one.*"

In the case of Brown v. Bulkley, 14 N. J. Eq. 451, a case analogous in principle to the one before us, it is said:

"Mr. Justice Sharswood, in his admirable lecture on 'Professional Ethics' for which the profession owe him a debt of gratitude (page 92), states the rule thus: 'When the relation of solicitor

and client exists, and a security is taken by the solicitor from his client, the presumption is that the transaction is unfair, and the onus of proving its fairness is upon the solicitor.' This statement of the principle is fully supported by the authorities. Hill on Trustees, 160 (Ed. 1857), and cases in notes; 1 Story's Eq. Jur. §§ 310-313 (Redfield's Ed.), and cases in notes.

"The rule at first view may seem harsh, and against the benignant principle of the law that fraud is never to be presumed. But it rests upon broad and clear principle; and all experience has shown that it is eminently salutary in its influence, and productive of no real injury to the upright and conscientious practitioner. Such security is not per se fraudulent; but when the consideration is challenged, it stands as security only for the amount really due."

In Kidd v. Williams, 132 Ala. 140, 31 South. 458, 56 L. R. A. 879, it was said:

"The principle in all our cases is that while the confidential relation lasts, and as to its subject-matter, there must be no abuse of confidence with respect to it, by which the attorney secures an unjust advantage over the client. It is easy to see that in such time, and as to the business in which he is employed, the attorney could make unfair and unconscionable demands to which the client would yield, although he regarded them unjust, out of the fear of the consequences of a refusal, or from the attorney's undue influence over him."

In Burnham v. Heselton, 82 Me. 495, 20 Atl. 80, 9 L. R. A. 90, the court said (the underscoring being ours) :

"Especially does the law require the highest degree of honor and good faith from its own ministers. It insists that the confidence of the suitor in the faithfulness and disinterestedness of his attorney and counsellor shall be fully deserved. * * * It greatly desires that the attorney should be satisfied with a reasonable compensation, without seeking to obtain speculative bargains from his client. As said by one writer, such a transaction may be valid, but it is presumptively invalid. Where any such bargain is made, the burden of sustaining it is on the attorney. No presumption will avail him. He cannot get behind the presumption of innocence and await the coming of hostile enemies. He must be aggressive and advance against the presumption of invalidity,

and overcome it, if he can, by evidence of 'the perfect fairness, adequacy, and equity of the transaction,' *and particularly must he show that his client was informed of all material facts known to himself.* Dunn v. Record, 63 Me. 17; Arden v. Patterson, 5 Johns. Ch. [N. Y.] 44; Rogers v. Marshall [(C. C.) 13 Fed. 59] 3 Mc-Crary, 87; 4 Kent's Com., notes to, § 449; Weeks on Attorneys at Law, § 268, and notes. It has even been held by high authority that such transactions are conclusively invalid—that the presumption of invalidity cannot be overcome. Newman v. Paine, 3 Ves. 203; Wallis v. Loubat, 2 Denio [N. Y.] 607; Wayne, J., in Michoud v. Girod, 4 How. 555, 11 L. Ed. 1076."

In Hill v. Hall, 191 Mass. 253, 77 N. E. 831, a case involving a purchase by a client from his attorney, the court announced the rule controlling transactions between attorneys and clients while the relation of attorney and client exists, as follows:

"The attorney must see to it that his client is so placed as to be enabled to deal with him at arm's length, without being swayed by the relation of trust and confidence which exists between them. This principle is established both in England and in this country. It is one example of the general doctrine which the law applies to dealings between parties who stand in a fiduciary relation to each other. Smith v. Kay, 7 H. L. Cas. 750. 'The broad principle on which the court acts in cases of this description is that wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him.'"

In Elmore v. Johnson, 143 Ill. 513, 32 N. E. 413, 21 L. R. A. 366, 36 Am. St. Rep. 401, the court said (the underscoring being ours):

"In England 'it is a settled doctrine of equity that an attorney cannot, while the business is unfinished in which he has been employed, receive any gift from his client, *or bind his client in any mode to make him greater compensation for his services than he would have a right to demand if no contract should be made during the relation.'* Weeks on Attorneys at Law [2d Ed.] § 364.

More than 50 years ago, the English doctrine was adopted by the
Supreme Court of Alabama in an able opinion in the case of Lecatt
v. Sallee, 3 Port. [Ala.] 115 [29 Am. Dec. 249], where it was held
that '*an agreement made by a client with his counsel after the*
*latter has been employed in a particular business, by which the*
*original contract is varied and greater compensation is secured to*
*the counsel than may have been agreed upon when he was first*
*retained, is invalid and cannot be enforced.*' The reason for the
doctrine is to be found in the nature of the relation which exists
between attorney and client. That relation is one of confidence,
and gives the attorney great influence over the actions and interests
of the client. In view of this confidential relation, transactions
between attorney and client are often declared to be voidable,
which would be held to be unobjectionable between other parties.
The law is thus strict, 'not so much on account of hardship in the
particular case, as for the sake of preventing what might otherwise
become a public mischief.' Lewis v. J. A., 4. Edw. Ch. [N. Y.]
marg. page 599; top page 622."

In the case of Bar Ass'n of Boston v. Hale, 197 Mass. 423,
83 N. E. 885, the court used the following words, applicable to
the facts of this case:

"The respondent did not put himself at arm's length from his
client before carrying out this transaction with her; he did not see
that she had independent advice, or secure her time to consider
this important matter."

We quote the following from sections 268 and 364, Weeks on
Attorneys at Law (the underscoring being ours):

"Sec. 268. * * * Dealings between attorney and client
are carefully and jealously regarded * * * to protect the
client even from his own acts, if done under the influence or sup-
posed ascendency which the attorney may have over him. * * *
Transactions ordinarily not open to the slightest objection have
been declared invalid as against a client. Whatever hardship may
arise in particular cases, the law, to prevent public mischief, and
to protect the client, declares that attorneys shall take no benefit
under such circumstances. Not until the relation has completely
ceased is the influence supposed to have completely ceased. Not
until then is the attorney safe in dealings outside of his profes-
sional duty. Not until then can the client even exhibit his gen-

erosity with safety to his counsel in the way of gifts or extra emoluments. This jealous care and scrutiny over such transactions extends to all gifts, conveyances, and contracts by the client, and all securities given by him pending the relation. * * * *An* *agreement made by a client with his attorney after the latter has been employed in a particular business, by which the original contract is varied and greater compensation is secured to the counsel than may have been agreed upon when first retained, is invalid, and cannot be enforced.* An attorney in all transactions with his client is regarded as acting in a fiduciary capacity. Attorney and client sustain to each other the severe relation of trustee and cestui que trust, and their dealings with each other are subject to the same intendments and imputations as obtain between other trustees and their beneficiaries.

"The rule applicable to transactions between an attorney and client, such as contracts, sales, gifts, etc., is, that the attorney who bargains in a matter of advantage to himself with his client is bound to show that the transaction is fair and equitable; that he fully and faithfully discharged his duties to his client, without misrepresentation *or concealment of any fact material to the client*; that the client was fully informed of his rights and interests in the subject-matter of the transaction, and the nature and effect of the contract, sale, or gift, and was so placed as to be able to deal with his attorney at arm's length."

"Sec. 364. * * * *The question whether an attorney, during the relation between his client and himself can make with his client a binding contract to secure to himself greater compensation for his services than was agreed on when the relation commenced has been decided in the negative.*"

In the recent work, Thornton on Attorneys at Law, at § 432, it is stated, in relation to contracts entered into between attorneys and clients after such relation exists:

"It will require the most convincing proof of good faith on the part of the attorney, and of full knowledge of the terms of the contract, and entire freedom of action, on the part of his client, before a court will sanction the agreement. So where an attorney, during the continuance of the fiduciary relation, procures from his client a contract for greater compensation than that originally agreed upon, the transaction will be deemed presumptively void."

The following facts are, under the authorities cited, conclusive against plaintiff: At the time it is claimed this contract was entered into, plaintiff was the retained attorney for defendant, retained to represent her in the divorce action, and as such to represent her in all matters pertaining to such action. Plaintiff had led defendant to believe that he was willing, even desirous, of doing everything she desired him to do in such action, even to the setting aside of the tentative agreement. She came to his office in the full belief that he, as her attorney, was willing and anxious to set aside such tentative agreement, if such was her desire. It is at least doubtful whether she knew that the tentative agreement included an agreement to withdraw the objectionable matter from the divorce petition. With her mind fully made up to have the tentative agreement set aside, in the hope that by so doing she would get a greater allowance from her husband's property, and also, perhaps, believing that it was only by so doing that she could hope to get the said objectionable charges withdrawn, she is, without any warning, and in the presence of a third person, a stranger to her, met with the proposition that, before her attorney will discharge his further duties as such attorney, she must agree to pay him $1,000 in addition to the former payment, part of which was still unearned, and this regardless of the amount or value of services he might be called upon to perform. She was not advised to seek independent advice before entering into such contract—she was not even advised to go home and think the matter over—but was permitted, without such independent advice from some disinterested source, and without taking further reflection, to enter into an agreement which plaintiff now claims to be binding upon her. Under these facts, even conceding the motives of plaintiff to have been the best, and that he honestly and wisely advised her that it was against her interests to open up the tentative agreement, and that he had no intent of, in any manner, overreaching or defrauding her, yet the contract is unenforceable. If the contract was void or voidable when entered into, no amount of services thereafter performed by plaintiff could render such contract enforceable.

The burden rested upon plaintiff to establish by clear and satisfactory evidence that his client was advised of all matters in any respect material to the question of the advisability of opening

up the tentative agreement. Certainly it cannot be presumed that defendant would have given, as one of her reasons for wanting the case opened up, her determination to have the obnoxious charges withdrawn, if she had clearly understood that it had been fully agreed that such charges would be withdrawn, and yet Miss Walz and Mr. Sallinger, both witnesses for plaintiff, state that she gave this as one reason why she was determined to have the matter opened up. When these statements were made by defendant, even though plaintiff had supposed she understood fully the terms of the tentative agreement, he should have then and there fully explained to her the fact that it was unnecessary to open up the case in order to get these charges withdrawn.

[3] But if there were no other ground for holding the contract unenforceable, it must be so held, owing to the terms thereof, and this, whether we would follow the rule as quoted from Weeks on Attorneys and upheld in Elmore v. Johnson, and Lecatt v. Sallee, to the effect that a contract entered into during the relation of attorney and client, whereby the attorney seeks to secure a greater compensation than he otherwise is entitled, is invalid, or whether we follow the rule, as quoted from Thornton on Attorneys, and upheld in Dickinson v. Bradford, to the effect that such a contract is presumptively void. Before allowing defendant to agree to pay him $1,000, it was incumbent upon plaintiff to fully explain to her the law—to advise her that, if he saw fit to continue as her attorney, he could only recover according to their previous conversation, or else but the reasonable value of his services (Dickinson v. Bradford, supra), and further, to advise her that, having accepted her employment, he could not lawfully withdraw from her service merely because she might refuse to enter into a satisfactory agreement as to future fees. The law does not give to an attorney, once retained in a case, the option to require from his client, as a condition to his further service in the matter for which he has been retained, that such client enter into an express contract as to compensation, where theretofore there had been no contract or a different contract. Furthermore, plaintiff was bound to explain to defendant that, if he withdrew from the case, he was bound to repay to her at least the unearned portion of the $250, which, under the evidence, would have been some $150. To put it another way, before plaintiff can claim to have

advised defendant fully in relation to her rights and his duties, he must show advice that was as full, free, and void of all personal consideration on his part as would have been the advice of any disinterested attorney to whom she might have gone, and this in relation to the agreement to pay the $1,000 as well as in relation to any other matter pertaining to the opening up of the case.

[4] But was the contract, if in every other respect fair and just, one that was reasonable as to its terms? It will not do to say that, because plaintiff may have performed services thereunder reasonably worth $1,000, the contract was a reasonable one. The services thereafter rendered may be controlling, in a proper action, in determining what plaintiff should recover, yet they in no manner throw any light upon the reasonableness of the contract, which depends, not only upon what did happen thereunder, but also upon what might happen thereunder—its reasonableness is to be determined, not only by the value of the services which it might become necessary to perform thereunder, but also by the value of the least services that might, in the contemplation of the parties, have constituted a full performance. A satisfactory settlement reached by one day's efforts would have been a full performance of the alleged contract. We have no hesitancy in declaring that, if the alleged contract was entered into at the time claimed, it was unreasonable in its terms. It might not be amiss to inquire the motive moving plaintiff to insist on this agreement for an express fee. The only reason given by plaintiff to defendant is found in his statement to defendant:

"I do not want to go into court with that case. I told Mc-Duffie & Keenan we had agreed, and it would be boylike for me to go back and try to kick this settlement over."

He was placing his professional pride in the balance against the rights of his client. We concede there might be facts justifying an attorney in refusing to continue in the service of his client, when to do so would entail a sacrifice of professional honor; but when, in one's professional career, an attorney is called upon to choose between serving his client and following the demands of professional honesty—to weigh the client's rights as against the attorney's sense of professional honor or even against his pride and his desires—the attorney certainly cannot be allowed to place a pot of gold over against his duty and the rights of his client;

common observation teaches us which way the scales will tip when in the hands of any person who sees fit to place his selfish desires over against his sense of duty. In the words of the court in Bolton v. Daily, supra, we say:

"It is difficult to conceive how plaintiff could be so complicated as to justify him remaining in a case for an extraordinary fee, but not for an ordinary one."

We may well close with the following from Waterbury v. City of Laredo, 68 Tex. 565, 5 S. W. 81:

"The rule which denies to an attorney the right to make an agreement with his client after an employment in a particular business, by which the contract is so raised as to secure greater compensation to the former than was first agreed upon, is wholesome, and has its foundation in principles adopted to secure clients against imposition. It tends to preserve the purity of the bar and to accomplish the ends of justice, and it ought not to be departed from unless in some case peculiar in its facts. This case presents no facts which can take it without the rule."

The judgment and order denying a new trial are reversed.

SMITH, P. J. (dissenting in part). While I approve the statements of the strict legal, moral, and ethical obligations of an attorney at law contained in the numerous quotations in the foregoing opinion, I am not prepared to concur in the conclusion that this court, upon the record before us, is at liberty to pronounce the alleged contract void, as a matter of law. The validity of a contract for legal services in such cases depends upon the determination of questions of fact—the facts and circumstances surrounding the entire transaction. Whether the relations and conduct of the parties were such as to render the alleged contract void or voidable was, I think, for the jury, under proper instructions. I cannot therefore concur in that clause of the opinion which says:

"We have no hesitancy in declaring that if the alleged contract was entered into at the time claimed, it was unreasonable in its terms."